## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEN COSYNS, derivatively on behalf of LUXURBAN HOTELS INC., | Case No.: 1:25-cv-02524 |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| BRIAN FERDINAND, SHANOOP KOTHARI, DAVID BERG, JIMMIE CHATMON, AIMEE NELSON, LEONARD TOBOROFF, and JEFFREY WEBB, | |
| Defendants, | |
| and | |
| LUXURBAN HOTELS INC. | |
| Nominal Defendant. | |

### <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Fen Cosyns ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant LuxUrban Hotels Inc. ("LuxUrban" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Brian Ferdinand ("Ferdinand"), Shanoop Kothari ("Kothari"), David Berg ("Berg"), Jimmie Chatmon ("Chatmon"), Aimee Nelson ("Nelson"), Leonard Toboroff ("Toboroff"), and Jeffrey Webb ("Webb") (collectively, the "Individual Defendants," and together with LuxUrban, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of LuxUrban, unjust enrichment, abuse of control,

gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Ferdinand and Kothari for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LuxUrban, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 9, 2023 through August 20, 2024, both dates inclusive (the "Relevant Period").

2.      LuxUrban is a Delaware-incorporated hospitality company. In August 2022, seeing an opportunity from the downturn in the hospitality industry caused by the COVID-19 pandemic, LuxUrban pivoted from providing short-term residential rentals of multi-family and individual properties, to the hotel space. LuxUrban's entry into the hotel space involved the utilization of Master Lease Agreements ("MLAs"). By using MLAs, LuxUrban would not own any of its hotels outright but would rather enter long term leases with hotels and then rent out the rooms themselves, generating revenue from room rentals and other hotel fees such as check-in and

check-out fees and food services. This opportunity was limited, so LuxUrban sought to quickly increase the number of hotels under its MLAs to fund operations and future growth.

3.      In August 2023, recognizing its own limited experience in hotel management, the Company announced that it was partnering with Wyndham Hotels & Resorts, Inc. ("Wyndham"). This partnership with Wyndham would purportedly increase LuxUrban's brand recognition and streamline the Company's hotel business by rebranding the Company's hotel portfolio into one of Wyndham's "Trademark Collection" and "Travelodge" brands. The partnership with Wyndham also allowed the Company to utilize Wyndham's online booking platform which would decrease the Company's operating costs. Wyndham also agreed to provide the Company with capital on a property-by-property basis.

4.      During the Relevant Period, the Individual Defendants made multiple false and misleading statements about the number of hotels with which the Company had executed MLAs. On May 9, 2023 the Company claimed it had executed an MLA for the Trinity Hotel. Similarly, on November 8, 2023, the Company claimed it had executed an MLA with the Royalton Hotel in New York City. Weeks later, on November 30, 2023, the Company claimed it had executed an MLA with the Truss Hotel in New York City. The Company also claimed it had executed an MLA for the James NoMad Hotel in New York City, which would have been the largest MLA in the Company's history. In fact, all of these statements were false, as the Company in truth never signed MLAs for any of the properties mentioned above.

5.      The truth began to emerge on January 17, 2024 when Bleecker Street Research issued a report (the "Bleecker Street Report") alleging that the Company had not actually executed an MLA with The Royalton Hotel and that the Company had announced three other hotel deals before the Company actually executed MLAs with the property owners. The Bleecker Street

Report also questioned disclosures in the Company's Form 10-Q for the third quarter of 2023, alleging that the Company did not have all of the disclosures required by the generally accepted accounting principles in the United States of America ("GAAP"). The Bleecker Street Report also noted issues with the Company's Receivables from On-Line Travel Agents (the "OTAs"), stating:

> The company recorded $22.8 million in revenues in Q1 2023, with none of those sales resulting in receivables from OTAs. But in Q2 and Q3, the combined revenue of $63 million resulted in ~$13 million in OTA pending payments. Even odder, the company switched to management under Wyndham in early Q3 (August), which management claims will result in fewer OTA bookings, but the QoQ [quarter over quarter] value of OTA Receivables went from $5.9 million to $12.9 million in this first quarter under the Wyndham banner.

6.      The Company disputed the allegations in the Bleecker Street Report, claiming that the report had "multiple inaccuracies" and that Bleecker Street Research was not familiar with the industry. LuxUrban also doubled down on its false statements by stating, "[a]s previously announced, the Company is scheduled to begin welcoming guests on or before January 30, 2024 at The Royalton by LuxUrban, Trademark Collection® by Wyndham, and has a set date with the property's ownership to be delivered possession of the asset."

7.      On this news, LuxUrban's stock price fell $0.58 per share, or 12%, on January 17, 2024, and fell another $0.30 per share, or 10%, the following day, to close at $3.89 per share on January 18, 2024.

8.      The truth continued to emerge when "The Royalton by LuxUrban, trademark Collection ® by Wyndham" did not begin to welcome guests on January 30. Moreover, on February 2, 2024, LuxUrban announced "the termination of discussions to add the Royalton Hotel to its roster of properties," and further stated that "a complete set of definitive agreements relating to the lease were not, and will not be, entered into by the Company." The Company then stated that it would only announce acquisitions when the MLA process was fully completed. To soften

the blow to investors, however, Defendants falsely claimed that they had executed an MLA for the James NoMad Hotel, alleging it was the largest executed MLA in the Company's history.

9.      On this news, LuxUrban's stock price fell $0.99 or 22%, to close at $3.50 per share on February 5, 2024.

10.     The truth continued to emerge on March 12, 2024 when *Bisnow* reported (the "Bisnow Report") on LuxUrban's purported deal with The Royalton Hotel having failed to materialize. It also made allegations regarding additional deals that the Company had announced that did not have executed MLAs, stating:

> The company also said in its two most recent quarterly filings that it had the 179-room Trinity Hotel in Los Angeles "under lease," a deal that was announced in May. The Chetrit Group owns that hotel and denies it has a deal with LuxUrban.
>
> ***"The deal did not go through," Michael Chetrit told Bisnow in an email***.
>
> Ferdinand told *Bisnow* that LuxUrban "fully executed a lease," but claimed Chetrit didn't update the building at 741 Eighth Ave. to make the changes necessary for operating the hotel.
>
> "We even wired them money which we have not gotten returned," Ferdinand wrote. ***Ferdinand forwarded Bisnow an email, dated Oct. 2, from one of the company's attorneys, containing a draft letter to Chetrit outlining the lack of repairs at the building and demanding repayment.***
>
> ***In that letter, LuxUrban attorneys wrote, "As a result, we will not be executing the proposed lease and will not be taking possession of the Premises."[1]***

11.     On March 26, 2024, the Company announced that it had walked away from a deal with an unnamed hotel, which was later confirmed to be the Trinity Hotel.

12.     On May 10, 2024, *Bisnow* reported that LuxUrban's hotels were no longer accessible on Wyndham's online platforms. Three days later, on May 13, 2024, the Company announced that, on May 6, 2024, the Company had terminated its franchise agreements with

---

[1] All emphasis has been added unless otherwise noted herein.

Wyndham and would be moving the Company's hotel listings back under LuxUrban's full control.

13.    On this news, LuxUrban's stock price fell $0.085 per share, or almost 12%, from a closing price of $0.709 on May 9, 2024 to close at $0.624 per share on May 10, 2024.

14.    The truth fully emerged on August 21, 2024 when the Company issued an amendment on Form 10-Q with the SEC for a correct disclosure concerning the Company's financial statements and internal controls over financial reporting as of March 31, 2023 as set forth in its first quarter of 2024 Form 10-Q. The Company reported, *inter alia*, that: (i) the Company did not correctly apply charges allocated to the Channel Retained Funds, which resulted in a decrease in the Channel Retained Funds in the amount of $1,500,000; (ii) the Company failed to recognize a bad debt expense of $7,843,456; (iii) the Company incorrectly recognized revenue of reservations that were cancelled by the merchant service provider in the amount of $2,633,926; (iv) the Company incorrectly recognized receivables from On-line Travel Agencies in the amount of $6,749,769; (v) the Company incorrectly recognized receivables from the City of New York to the amount of $984,744; (vi) the Company did not reflect the net receivable due from the City of New York to a reduction of $3,201,640; (vii) the Company did not properly amortize prepaid real estate taxes in the amount of $342,212; and (viii) the Company incorrectly recognized revenue for reservations that were paid for, but for which the guest had not yet stayed at the property, in the amount of $8,050,248.

15.    On this news, the price of the Company's common stock fell $0.003 per share, or approximately 3.947%, from a closing price of $0.076 per share on August 20, 2024, to close at $0.073 per share on August 21, 2024. The following trading day, it fell to $0.071 per share.

16.    Since the end of the Relevant Period, the Board has undergone numerous changes. Indeed, immediately prior to December 19, 2024, the Board consisted of Defendants Toboroff and

Nelson and non-parties Elan Blutinger ("Blutinger"), Kim Schaefer ("Schaefer"), and Alex Lombardo ("Lombardo"). On December 19, 2024, Defendant Toboroff and non-party Schaefer resigned. Defendant Nelson and non-parties Blutinger and Lombardo then nominated and elected Elster to fill one of the vacancies. On December 20, 2024, Defendant Nelson resigned from the Board and Blutinger, Lombardo, and Elster nominated Alex Moinian ("Moinian"), Daniel Shapiro ("Shapiro"), Defendant Ferdinand, and Bradley Theodore ("Theodore") to the Board. They also reappointed Defendant Ferdinand as the Company's CEO, thereby allowing him to continue breaching his fiduciary duties to the Company.

17.     During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by personally making and/or causing the Company to make a series of materially false and misleading statements to investors that failed to disclose, *inter alia*, that: (1) LuxUrban had not signed an MLA for either the Royalton Hotel or the Truss Hotel, and neither property was an "operating" property for LuxUrban; (2) neither the Royalton Hotel or the Truss Hotel were "under lease,"; (3) LuxUrban had no basis to state that the Royalton Hotel or the Truss hotel would "open[]" "on or around December 1, 2023,"; (4) the Trinity Hotel in Los Angeles was not "under lease,"; (5) LuxUrban's reported totals of properties under lease, operating, and properties under lease, not operating, were materially overstated at all relevant times; and (6) the statements created a false impression of the Company's growth. As a result of the foregoing, the Company's statements were materially false and misleading and/or lacked a reasonable basis at all relevant times. Additionally, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

18.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), and its former Chief Financial Officer ("CFO") and Co-CEO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20.     For the reasons set forth herein, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25.    Plaintiff is a current shareholder of LuxUrban. Plaintiff has continuously owned Company common stock at all relevant times.

### Nominal Defendant LuxUrban

26.    LuxUrban is a Delaware corporation with its principal executive offices at 212 Biscayne Blvd, Suite 253, Miami, FL 33137. LuxUrban common stock trades on the OTC market under the ticker symbol "LUXH."

### Defendant Ferdinand

27.    Defendant Ferdinand is a co-founder of the Company and co-founded the Company's predecessors, SoBeNY Partners LLC and Corphousing LLC. Defendant Ferdinand served as the Company's CEO since its inception until November 8, 2023. Defendant Ferdinand then served as Co-CEO with Defendant Korthari until March 1, 2024, when Defendant Ferdinand began to transition from the CEO position until May 31, 2024. Ferdinand continued to serve as Executive Chairman of the Board until he resigned from the Board on June 27, 2024. He was reappointed to the Board on December 20, 2024. Also on December 20, 2024, Defendant Ferdinand was named as Interim CEO.

28.    During the Relevant Period, before the false and misleading statements were exposed, Defendant Ferdinand sold approximately 726,556 shares of Company stock on inside

information, for which he received approximately $5,100,806 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

29.     The Form 8-K the Company filed with the SEC on December 20, 2024 stated the following about Defendant Ferdinand:

> Mr. Ferdinand has served as Interim Chief Executive Officer and as a member of our Board since December 2024. Previously, Mr. Ferdinand served as Chief Executive Officer and Chairman of the Board of the Company prior to transitioning into a consultant role. Mr. Ferdinand was the Founder and Manager of both Corphousing LLC and SoBeNY Partners LLC prior to their conversions into C corporations in January 2022, and has been the Chief Executive Officer (or Co-Chief Executive Officer) and Chairman of the Board of our company since that date. Prior to founding our company in 2017, Mr. Ferdinand was Chief Operating Officer and a partner at VacationRentals LLC, a provider of loyalty-branded, hotel-alternative accommodations, and prior to that, from 2011 through 2014, Mr. Ferdinand served as a member of the Board of Directors and Head of Corporate Strategy at Liquid Holdings, Inc. ("Liquid"), a designer and operator of fintech-based brokerage order execution platforms and services. Liquid filed for Chapter 11 bankruptcy protection in January 2016. From 2002 through 2011, Mr. Ferdinand served as Managing Director and partner at ECHOTrade LLC, a proprietary trading firm, where he oversaw that company's expansion from 30 to nearly 1000 licensed traders working in offices throughout the United States and internationally in a joint back-office partnership with Merrill Lynch and Bank of America. Mr. Ferdinand entered into an Offer of Settlement with the Securities and Exchange Commission on April 22, 2020, in connection with allegations that he, as a board member of Liquid Holdings Group Inc., (a) reviewed a Form 10-Q and signed a Form 10-K for the fiscal year 2013 that failed to disclose material facts of Liquid's reliance on a related party entity (a principal customer of Liquid and a company of which Mr. Ferdinand was an owner) and from which Liquid received material subscription fees, and (b) failed to file required Forms 4 and amendments to Schedule 13D to reflect material changes to his ownership in Liquid's shares of common stock, causing Liquid to violate Section 13(a), 13(d)(2) and 16(a) of the Exchange Act and related rules thereof. Mr. Ferdinand consented, without admitting or denying any findings, to a cease and desist order from any alleged secondary violations of Section 17(a)(2) of the Securities Act and 13(a) of the Exchange Act, which are non-scienter provisions in which negligence is sufficient to establish liability for causing a primary violation; and Section 13(d)(2) and Section 16(a) of the Exchange Act, which are personal security reporting provisions under which strict liability is sufficient to establish a violation. As a result of the settlement, Mr. Ferdinand was also required to pay a fine of $115,000.

**Defendant Kothari**

30.     Defendant Kothari served as the Company's CFO from January 2022 until June 2024. Defendant Kothari also served as the Company's President from November 30, 2022 until

June 2024. Defendant Kothari was also appointed as Co-CEO with Defendant Ferdinand from November 2023 until March 2024, when Defendant Kothari served as sole CEO until his termination on June 10, 2024.

31.     The Schedule 14A the Company filed with the SEC in 2023 (the "2023 Proxy Statement") stated the following about Defendant Kothari:

> Mr. Kothari has been our Chief Financial Officer since January 2022 and our President since January 2023. From January 2019 until September 2021, Mr., Kothari was the Chief Financial Officer of NuZee Inc (Nasdaq: NUZE), an environmentally friendly coffee co-packing services company. From July 2020 until May 2021, Mr. Kothari also served, in dual capacity, as NuZee's Chief Operating Officer. In addition, Mr. Kothari served as a director of NuZee from October 2019 to March 2021. Prior to joining NuZee, Mr. Kothari was a Managing Director at B. Riley FBR, Inc. ("FBR") from June 2014 until September 2018, where he oversaw the provision of a wide range of financial services to FBR's oil and gas clients. From September 2012 to June 2014, Mr. Kothari was the Chief Financial Officer of a private oil and gas refinery joint venture with HollyFrontier. Mr. Kothari was an investment banker at Credit Suisse working in the energy industry investment segment from June 2005 until September 2012. From May 1998 until April 2003, Mr. Kothari served in variety of capacities for BindView Development, a publicly traded software company, including as Chief Financial Officer (from January 2001 to May 2001). Mr. Kothari was senior auditor at Price Waterhouse, an international accounting and consulting firm, from June 1995 to May 1998. Mr. Kothari has more than 25 years of accounting, finance and capital markets experience. Mr. Kothari holds a BA in Accounting from Southern Methodist University and an MBA from Rice University. Mr. Kothari is also a licensed CPA and CIA and possesses Series 7 / 24 / 63 licenses.

**Defendant Toboroff**

32.     Defendant Toboroff served as a Company director from June 2021 to December 2024. Defendant Toboroff also served as a member of the Audit Committee.

33.     The 2023 Proxy Statement stated the following about Defendant Toboroff:

> Mr. Toboroff has served as one of the independent directors of our company since June 2021. Mr. Toboroff is a private investor. He was the Executive Vice President and Vice Chairman of the Board of Allis-Chalmers Energy Inc., a provider of products and services to the oil and gas industry, from 1988 to 2007. He was a director (and finance committee member) and Vice Chairman of Riddell Sports Corp., a sporting goods manufacturer, from 1988 to 2003. From 1998 until its sale

in 2006, Mr. Toboroff was a director (and finance committee member) and Vice Chairman of Varsity Brands, Inc. a provider of goods and services to the school spirit industry. From 1988 to 1995 he was a director (and finance committee member) of Saratoga Springs Water Co. From 1989 to 1998, he was Managing Director of the Corinthian Capital Group, LLC, a private equity fund. From 2005 to 2008, Mr. Toboroff was a director (and finance committee member) of ENGEX Corp., a closed-end mutual fund. From 2001 to 2004, he was a director of NOVT Corp. a developer of advanced medical treatments for coronary and vascular disease. From 2006 to 2009, he was a director of Asset Alliance Corp., an alternative investment company. From 1987 to 1988, Mr. Toboroff was Head of M&A at Rooney Pace Co. Investment Bank. From 1980 to 1990, Mr. Toboroff was the Chairman or Vice Chairman of American Bakeries Co., a Fortune 500 company. Mr. Toboroff also has been a founding shareholder in various companies that completed their public offering including in fields of game technology, crowdfunding, and medical marijuana. Mr. Toboroff was a practicing attorney from 1960 to 1990, engaging in appellate practice in various federal courts and the U.S. Supreme Court and is a member of the US Supreme Court Historical Society. Mr. Toboroff is a graduate of Syracuse University and the University of Michigan Law School.

**Defendant Nelson**

34.     Defendant Nelson served as a Company director from August 2022 until December 2024. Defendant Nelson also served as the Chair of the Audit Committee.

35.     The 2023 Proxy Statement stated the following about Defendant Nelson:

Ms. Nelson has served as one of our independent directors since consummation of our IPO in August 2022. From June 2020 to present, Ms. Nelson has provided various clients with financial and strategic consulting services through her firm, AJAY Ventures. From January 2020 to June 2020, she was the Chief Financial Officer of Cuisine Global, a plant-based food and lifestyle company, where she implemented new accounting and vendor management systems, oversee assets sales, and created annual budgets and strategic plans. From April 2014 to May 2018, she was a Managing Director at Fifth Third Bank, a national bank, where she oversaw a portfolio of corporate lending clients, ranging from starts ups to mature high-revenue businesses. From January 2012 to April 2014 she was a consultant to Wild Oats, LLC, a development stage company funded by Yucaipa Companies, overseeing the formation of a joint venture with Daymon Worldwide to launch more than 160 fresh foods and nonfood products through global retail chains. From June 2010 to December 2011 she was a finance consultant to Key Development, LLC, a family office, consulting with that company on the areas of business acquisitions and opportunities. From 1999 to May 2010 she worked in various capacities at national banks, including JPMorgan Chase, Compass Bank, Wachovia Bank and Park Cities Bank, where she helped building portfolios of banking clients

and assisted in business growth initiatives, including in the areas of real estate and commercial real estate lending. She received her BBA from Texas Christian University and her MBA from Southern Methodist University.

**Defendant Webb**

36.      Defendant Webb served as Company director from August 2022 until December 2024. Defendant Webb also served as a member of the Audit Committee.

37.      The 2023 Proxy Statement stated the following about Defendant Webb:

Mr. Webb has served as one of our independent directors since consummation of our IPO in August 2022. Mr. Webb became Chairman and Chief Executive Officer of Varsity Brands when that company was formed in 2012 from the merger of Varsity Spirit Corporation, a company founded by Mr. Webb, and Herff Jones, a leading producer of high school and college graduation apparel and class rings. He stepped down as CEO of Varsity Brands in 2016. He continued to serve as Chief Executive Officer of Varsity Brands through its acquisition by Bain Capital Private Equity for $2.8 billion in 2018, and ultimately retired as its Chairman in 2020. In 1974, Mr. Webb founded Varsity Spirit Corporation, a company that develops nationwide training camp systems, distributes uniforms and equipment, and produces national televised championship competitions, tours and performance for and featuring collegiate and high school spirit and cheerleading organizations. Events produced by Varsity Spirit Corporation include high-profile events such as the Macy's Thanksgiving Day Parade in New York, the Citrus Bowl, and various European events. Prior to founding Varsity Spirit Corporation, from 1972 to 1974, he served in various capacities with Cheerleader Supply Company, a distributor of spirit and cheerleading uniforms and equipment, including as its Vice President and General Manager. Mr. Webb is the founder of the Universal Cheerleading Association (UCA). He is also the founder and current President of the International Cheer Union, the world governing body of the sport of cheerleading. Mr. Webb received his B.S. degree in political science from the University of Oklahoma.

**Defendant Berg**

38.      Defendant Berg served as Company director from August 2022 until December 2024.

39.      The 2023 Proxy Statement stated the following about Defendant Berg:

Mr. Berg has served as one of our directors since consummation of our IPO in August 2022. Since January 2018, Mr. Berg has served as Partner of Infinity Collective, parent company of Infinity Real Estate, a private real estate investment and development company based in New York that owns, manages, and has

developed over two million square feet of space, overseeing Infinity's middle-market acquisitions, investment ventures, and the implementation of the firm's overall investment strategy within Infinity's expanding portfolio in New York City, Washington, D.C., Philadelphia, and Miami. From September 2011 to December 2018, he was Director of Investments at Infinity. From April 2010 to September 2011, Mr. Berg served as an Investment Manager at Monday Properties, a real estate investment firm that owns and operates properties primarily in New York City and the greater Washington, D.C. metro area where he focused on the asset management of Class-A office towers. From August 2009 to April 2010, Mr. Berg was Vice President of Acquisitions at Mermelstein Development, an international real estate company principally engaged in the acquisition, ownership, investment, management and development of residencial, commercial and mixed-use properties, where he focused on mixed-use multi-family and retail-oriented investments. Mr. Berg started his career as an Investment Banking Analyst at RBC Capital Markets from June 2008 to July 2009. Mr. Berg graduated from the Goizueta Business School at Emory University.

**Defendant Chatmon**

40.     Defendant Chatmon served as Company director from November 2021 until February 2024. Defendant Chatmon also served as the Company's Chief Operating Officer ("COO") from November 2022 and Executive Vice President from November 2017 until February 2024.

41.     The 2023 Proxy Statement stated the following about Defendant Chatmon:

Mr. Chatmon was named Chief Operating Officer in November 2022. He has served as our Executive Vice President since November 2017 and as a director of our company since November 2021. In this role he has helped our company grow in the short-term rental marketplace, drawing upon his prior experience and analytical expertise in designing our daily pricing and distribution strategies, while overseeing our revenue management team. Before joining our company, from July 2016 to November 2017, Mr. Chatmon worked in sales and revenue management at Vacation Rentals LLC, a provider of loyalty-branded, hotel-alternative accommodations. Mr. Chatmon earned his B.S. in Business Administration from the University of Miami in 2015.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

42.     By reason of their positions as officers, directors, and/or fiduciaries of LuxUrban and because of their ability to control the business and corporate affairs of LuxUrban, the

Individual Defendants owed LuxUrban and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage LuxUrban in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of LuxUrban and its shareholders so as to benefit all shareholders equally.

43.     Each director and officer of the Company owes to LuxUrban and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of LuxUrban, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

45.     To discharge their duties, the officers and directors of LuxUrban were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LuxUrban, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company

has been ratified by the remaining Individual Defendants who collectively comprised a majority of LuxUrban's Board at all relevant times.

47.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the OTC, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

48.    To discharge their duties, the officers and directors of LuxUrban were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of LuxUrban were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to LuxUrban's own Code of Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how LuxUrban conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of LuxUrban and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that LuxUrban's operations would comply with all applicable laws and LuxUrban's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49.    Each of the Individual Defendants further owed to LuxUrban and the shareholders the duty of loyalty requiring that each favor LuxUrban's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

50.     At all times relevant hereto, the Individual Defendants were the agents of each other and of LuxUrban and were at all times acting within the course and scope of such agency.

51.     Because of their advisory, executive, managerial, directorial, and controlling positions with LuxUrban, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

52.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by LuxUrban.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

53.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

54.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

55. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of LuxUrban was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

57. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of LuxUrban and was at all times acting within the course and scope of such agency.

**LUXURBAN'S CODE OF CONDUCT**

58. LuxUrban's 2022 Proxy Statement states that the Company's Code of Conduct "establishes standards of ethical conduct applicable to all of our directors, officers, employees, consultants and contractors."

59. The 2022 Proxy Statement further states:

The code of ethics addresses, among other things, competition and fair dealing, conflicts of interest, financial matters and external reporting, compliance with

applicable governmental laws, rules and regulations, company funds and assets, confidentiality and corporate opportunity requirements and the process for reporting violations of the code of ethics, employee misconduct, conflicts of interest or other violations. Any waiver of our code of ethics with respect to our Chief Executive Officer, Chief Financial Officer, Secretary and Treasurer, Chief Operating Officer and President, or persons performing similar functions may only be authorized by our Nominating and Corporate Governance Committee and will be promptly disclosed as required by law and Nasdaq regulations and posted on our website. Amendments to the code of ethics must be approved by our Board of Directors and will be promptly disclosed and posted on our website (other than technical, administrative or non-substantive changes). Our code of ethics is publicly available on our website at *http://www.luxurbanhotels.com* and in print to any stockholder who requests a copy.

## LUXURBAN'S AUDIT COMMITTEE CHARTER

60.    LuxUrban's 2022 Proxy Statement states that the "Audit Committee charter provides guidelines for the pre-approval of independent auditor services."

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background*

61.    Defendant Ferdinand co-founded both SoBeNY Partners LLC ("SoBeNY LLC") and Corphousing LLC ("Corphousing LLC"). Members of each entity had parallel ownership, and both entities were under common control. In June 2021, members of SoBeNY LLC exchanged membership interest for membership interest in Corphousing LLC, and SoBeNY LLC thereafter became a wholly-owned subsidiary of Corphousing LLC. In January 2022, Corphousing LLC and SoBeNY LLC converted into C corporations. In November 2022, Corphousing Group Inc. was renamed to LuxUrban Hotels Inc.

62.    LuxUrban originally focused on renting individual and multi-family residential properties but saw the massive downturn in the hospitality industry from the COVID-19 pandemic as an opportunity for growth and pivoted its focus to leasing hotel properties. To fund its entry into the hotel industry, the Company went public in August 2022. The prospectus and registration

statement that the Company filed with the SEC (together, the "IPO Prospectus") represented to investors that it wished to "capitaliz[e] on the dislocation in the hotel industry created by the pandemic and subsequent rising interest rate environment" and that "[a]s a result of the global COVID-19 pandemic, we believe that we can rapidly commercialize acquired units leveraging our established operating infrastructure." The IPO Prospectus also detailed that LuxUrban was planning on growing its portfolio of hotels by leasing properties and was planning on utilizing its own proprietary sales portal as well as OTAs.

63.    The IPO was completed on August 16, 2022, and in connection therewith, the Company sold 3,375,000 shares of its common stock at a price of $4 per share, generating gross proceeds of $13.5 million.

64.    Upon going public, the Company sought to distinguish itself from its competitors by entering into long-term lease agreements with hotels under MLAs. The MLA strategy was attractive to the Company because it allowed the Company to operate and profit off of the property without requiring nearly as much capital as compared to owning hotel properties outright. This minimal capital approach was crucial for LuxUrban's rapid entrance into the hotel market. The Company told investors that it expected to have 2,500 to 3,000 rooms in its hotel portfolio by the end of 2023.

65.    The Company sought to target distressed hotels when executing MLAs. Distressed hotels are particularly receptive to entering into an MLA with the Company because it allows the property owner to improve cash flows without losing ownership of the property. The MLAs were also "triple net", whereby the Company would cover the operating expenses (including taxes, insurance, utilities, and maintenance costs) as well as pay rent to the property owners acting as landlords.

66.    Defendant Ferdinand explained the approach to target distressed hotels as follows: "We are focused exclusively on dislocated hotel assets, meaning hotel assets that have debt maturities. The hotel is currently performing, but really the ownership groups or owners of those assets require refinancing. And in this current environment really the only way for the owner to refinance into a fixed rate mortgage is through a triple-net master lease. LuxUrban has become and is becoming the go to for that."

67.    On August 3, 2023, Defendants announced that the Company had entered into a partnership with Wyndham. The partnership would purportedly involve a franchising agreement, where seventeen of the Company's hotels, as well as future acquired properties, were to be renamed under the "Trademark Collection® by Wyndham" and "Travelodge by Wyndham" brands. The initial terms of the franchise agreement were fifteen to twenty years depending on the property and required Wyndham to provide sales, as well as financial and operational-related support, to sixteen initial properties. Under the franchise agreement, Wyndham would provide capital through development advance notes ("Development Incentive Advances"). Development Incentive Advances were not repayable if the terms of the agreement were met. The Company paid a one-time, initial non-refundable franchise fee to Wyndham.

68.    The partnership with Wyndham also allowed the Company's properties to appear on Wyndham's online booking platform, which had over 100 million members, and further allowed the Company to have lower OTA commission rates.

## FALSE AND MISLEADING STATEMENTS

### May 9, 2023 Press Release and May 10, 2023 Form 8-K

69.    The Relevant Period began on May 9, 2023 when the Company issued a press release titled "LuxUrban Hotels Inc. Announces Record 2023 First Quarter Financial Results."

The Company also filed the press release with the SEC on May 10, 2023 as an attachment to a Form 8-K. The Form 8-K was signed by Defendant Ferdinand.

70.    The press release stated that "[a]s of May 9, 2023," the Company had 20 short-term stay hotels under MLA consisting of 1,673 rooms that will be hosting guests from early Q2 to early Q3."

71.    This statement was materially false and misleading because 179 of the rooms included in the 1,673 figure were from the Trinity Hotel, a property which had not executed an MLA with the Company. Thus, the Trinity Hotel was not under a lease with the Company, meaning that the number of rentable rooms the Company represented it had to investors was artificially high and created a false picture of LuxUrban's growth.

### *May 9, 2023 Form 10-Q*

72.    On May 9, 2023, the Company filed its quarterly report on Form 10-Q for the first quarter of 2023 with the SEC (the "1Q2023 10-Q"), which was signed by Defendants Ferdinand and Kothari. The 1Q2023 10-Q contained substantially the same misleading statements as set forth in ¶70 by including the Trinity Hotel in the Company's figures for its total rooms available for rent and number of properties under MLAs even though the Trinity Hotel did not have an executed MLA.

### *May 15, 2023 Press Release and May 17, 2023 Form 8-K*

73.    On May 15, 2023, the Company filed a press release titled "LuxUrban Hotels Signs Master Lease Agreement to Operate Luxury Hotel in New York City Adding 204 Units to Property Portfolio." On May 17, 2023, the press release was attached to a Form 8-K that the Company filed with the SEC (the "May 7 Form 8-K"). The May 7 Form 8-K was signed by Defendant Ferdinand. The May 17 Form 8-K contained substantially the same misleading statements contained in ¶70

by including the Trinity Hotel in the Company's figures for its total rooms available for rent and number of properties under MLAs even though the Trinity Hotel did not have an executed MLA.

### *May 22, 2023 Investor Presentation filed on Form 8-K*

74.     On May 22, 2023, the Company filed a Form 8-K with the SEC (the "May 22 Form 8-K"), which was signed by Defendant Kothari. An investor presentation dated "May / June 2023" was attached to the May 22 Form 8-K which included substantially the same misleading information contained in ¶70 by including the Trinity Hotel under the number of properties under MLA and included the Trinity Hotel's rooms under the Company's rentable room totals.

### *August 8, 2023 Press Release and Form 8-K*

75.     On August 8, 2023, the Company issued a press release titled "LuxUrban Hotels Inc. Announces Record 2023 Second Quarter Financial Results." The following day, the Company attached this press release filed with the SEC (the August 9 Form 8-K.") The press release contained substantially the same misleading statements set forth in ¶72 by including the Trinity Hotel in the Company's rentable room totals and number of properties under MLA even though the Trinity Hotel did not have an executed MLA with the Company.

### *August 8, 2023 Form 10-Q*

76.     On August 8, 2023, the Company filed its Form 10-Q with the SEC (the "2Q2023 Form 10-Q"), discussing its results for the second quarter of 2023. Defendants Ferdinand and Kothari signed and certified the 2Q2023 Form 10-Q. The 2Q2023 Form 10-Q contained substantially the same misleading statements contained in ¶70 by including the Trinity Hotel in the Company's rentable room totals and number of properties under MLAs which artificially inflated the number of rooms the Company had available and thus created a false impression of LuxUrban's growth and success with its MLA model.

*August 9, 2023 Earnings Call*

77.    On August 9, 2023, the Company hosted an earnings fall to discuss the Company's second quarter results. Defendant Kothari repeated substantially the same false and misleading statements contained in ¶70 by including the Trinity Hotel in the rentable room totals and total number of properties under MLA even though there was not an executed MLA with the property.

*September 1, 2023 Investor Presentation*

78.    On September 1, 2023, the Company filed a Form 8-K with the SEC (the "September 1 Form 8-K") which was signed by Defendant Ferdinand. An investor presentation was attached to the September 1 Form 8-K which contained substantially the same misleading statements contained in ¶70 by including the Trinity Hotel in the number of properties under MLA and included the Trinity Hotel rooms under the Company's rentable room totals.

*November 8, 2023 Form 10-Q*

79.    On November 8, 2023, the Company filed its quarterly report Form 10-Q for the third quarter of 2023 with the SEC (the "3Q2023 10-Q"), which was signed by Defendants Ferdinand and Kothari.

80.    The 3Q2023 10-Q stated, under "Property Summary":

We enter into triple net leases in which we are responsible for all of the costs on the property outside of exterior structural maintenance. *As of September 30, 2023, we leased 16 properties with 1,446 units available for rent. As of November 8, 2023, we leased 18 properties with 1,599 units available for rent. As of November 8, 2023, including properties under lease but not yet available for rent we leased 21 properties with 2,032 units. Our portfolio of properties as of November 8, 2023, was as follows[.]*

81.    The table above the quote in the section "**Properties under lease**, not operating" included the "Trinity: 741 8th 851 South Grand Avenue, Los Angeles, CA 90017," as well as the "Royalton: 44 W 44th Street, New York, NY 10036" addresses. The Royalton added 168 rooms

to the Company's portfolio. However, just as with the Trinity Hotel, the Company did not have an executed MLA with the Royalton Hotel, and thus it was not among the Company's properties. The inclusion of the Trinity Hotel and the Royalton Hotel artificially inflated the Company's growth and the success associated with its business model.

### November 8, 2023 Press Release and November 9, 2023 Form 8-K

82.    On November 9, 2023, the Company filed a Form 8-K with the SEC (the "November 9 Form 8-K"), which was signed by Defendants Ferdinand and Kothari. A press release titled "LuxUrban Hotels Inc. Announced Record 2023 Third Quarter Financial Results" was attached to the November 9 Form 8-K. The November 9 Form 8-K and press release were misleading because they contained substantially the same misleading statements contained in ¶70 and ¶81 by adding the Royalton Hotel and Trinity Hotel rooms to the Company's total rooms and number of properties under MLAs even though these properties did not have executed MLAs with LuxUrban.

### November 9, 2023 Q3 2023 Earnings Call

83.    On November 9, 2023, the Company held an earnings call regarding its third quarter 2023 earnings.

84.    During the call, Defendant Kothari stated:

During the quarter, we added four properties, a total of 360 units all in New York City. Looking at our portfolio, as of September 30, 2023, the company leased 16 properties with 1,446 units available for rent. As of November 8, 2023, the company leased 18 properties with 1,599 units available for rent. *And as of November 8, 2023, we leased 21 properties with 2,032 units, and these includes properties under lease but not yet available for rent*.

85.    These statements contained substantially the same materially false and misleading statements contained in ¶70 and ¶81 regarding the number of rooms available by LuxUrban and the number of properties with which the Company had executed MLAs.

26

***November 17, 2023 Press Release and Form 8-K***

86.    On November 17, 2023, the Company filed a Form 8-K with the SEC (the "November 17 Form 8-K"). The Company attached a press release to the November 17 Form 8-K titled "LuxUrban Hotels Announced Non-Dilutive Financing up to $10 Million to Accelerate Growth." The November 17 Form 8-K contained substantially the same false and misleading statements contained in ¶70 and ¶81 regarding the number of rooms available by LuxUrban and the number of properties with which the Company had executed MLAs.

***November 30, 2023 Press Release***

87.    On November 30, 2023, the Company issued a press release on *Business Wire* titled "LuxUrban Hotels to Operate Two New Four-Star Boutique Hotels in New York City: The Royalton Hotel and the Truss Hotel Times Square to Begin Welcoming Guests in December."

88.    The press release announced that the Truss Hotel was operating under a 25-year MLA. However, as with the Trinity Hotel and Royalton Hotel, the Company had never actually executed an MLA with the Truss Hotel. Instead, the Company falsely added another property to its portfolio and 85 additional rooms to the Company's rentable rooms total. The press release also contained substantially the same false and misleading statements contained in ¶70 and ¶81 regarding the number of rooms available by LuxUrban and the number of properties with which the Company had executed MLAs.

89.    The press release, which listed Defendant Kothari as the Company's contact, stated:

> ***LuxUrban Hotels Inc.*** ("LuxUrban" or the "Company") (Nasdaq: LUXH), which utilizes an asset-light business model to lease entire hotels on a long-term basis and rent out hotel rooms in these properties in key major metropolitan cities, today ***announced that it has signed separate 25-year Master Lease Agreements (MLA), inclusive of two five-year options, to operate two new boutique hotels in New York City: The Royalton Hotel and the Truss Hotel. These properties will be re-***

*branded as "The Royalton by LuxUrban" and "The Truss Hotel by LuxUrban" and are expected to begin welcoming guests early next month. LuxUrban expects both of these properties to be rebranded under the Trademark Collection® by Wyndham name over the next few months.*

90.     These statements were also misleading because they included the Trinity Hotel and Royalton Hotel in the Company's rentable rooms total and with respect to the number of properties with which LuxUrban had executed MLAs. Therefore, the Company had no basis to claim that either the Royalton Hotel or the Trinity Hotel would be re-branded under the "Trademark Collection® name over the next few months" and that either hotel would welcome guests by December 2023. These statements artificially inflated the Company's growth and success with the MLA model.

### December 1, 2023 Investor Presentation

91.     On December 1, 2023, the Company filed a Form 8-K with the SEC, which was signed by Defendant Kothari and attached an investor presentation.

92.     The presentation contained a slide that included the Trinity Hotel, Truss Hotel, and Royalton Hotel in the number of properties and units "under lease" with LuxUrban as of November 2023. These statements artificially inflated the Company's rentable rooms total and painted a false picture of the Company's growth and success with the MLA model.

### January 12, 2024 Press Release

93.     On January 12, 2024, the Company issued a press release titled "LuxUrban Hotels Announces that the Royalton by LuxUrban, Trademark Collection® by Wyndham Will Begin Welcoming Guests in January."

94.     The press release, which identified Defendant Kothari as a Company contact, stated "The Royalton by LuxUrban Collection® by Wyndham is expected to begin welcoming guests on or before January 30, 2024."

95.     These statements were materially false and misleading because the Royalton was not under an executed MLA and thus the Company could not "begin welcoming guests" on or before January 30, 2024, and the Royalton could not be part of the Wyndham "Trademark Collection®" on or before that date. These statements created a false narrative that the Royalton would begin to generate revenue for LuxUrban on or before January 30, 2024.

96.     The press release also stated the Company had 2,032 rooms under lease, which falsely included rooms from the Truss Hotel, Trinity Hotel, and Royalton Hotel.

**The Truth Starts Emerging as the False and Misleading Statements Continue**

***The Bleecker Street Report***

97.     On January 17, 2024, Bleecker Street Research published a report titled "LuxUrban Hotels (LUXH): The Bed Sheets Should Be Made Out Of Red Flags." The Bleecker Street Report revealed that the Royalton Hotel was not actually under lease by the Company. The Bleecker Street Report also stated that LuxUrban announced acquisitions of hotels before there were ever executed MLAs in place, including one hotel from a bankruptcy receiver; notably, however, that receiver was "not even aware of the purported acquisition when LuxUrban announced it in a press release."

98.     Regarding the Royalton Hotel, the Bleecker Street Report also stated that LuxUban did not provide a Letter of Credit to the Royalton Hotel, even though it had been several months since the Company had first engaged with the owners of the Royalton Hotel.

99.     In addition, the Bleecker Street Report detailed strange disclosures in the Company's balance sheet, alleging, among other things, that the Company failed to follow GAAP.

100.    The Bleecker Street Report also observed strange activity in the Company's Receivables from On-Line Travel Agents, noting:

The company recorded $22.8 million in revenues in Q1 2023, with none of those sales resulting in receivables from OTAs. But in Q2 and Q3, the combined revenue of $63 million resulted in ~$13 million in OTA pending payments. Even odder, the company switched to management under Wyndham in early Q3 (August), which management claims will result in fewer OTA bookings, but the QoQ [quarter over quarter] value of OTA Receivables went from $5.9 million to $12.9 million in this first quarter under the Wyndham banner.

101.    It was later revealed in August 2024 that the Defendants massively overstated this exact line item in the 1Q2023 10-Q.

102.    On this news, LuxUrban's stock price fell $0.58 per share, or 12%, on January 17, 2024. LuxUrban's stock price fell an additional $0.30 per share, or 10%, the following day, to close at $3.89 per share on January 18, 2024. Still, despite this partial emergence of the truth, Defendants continues to actively mislead investors regarding its purported deals with the Royalton Hotel and Trinity Hotel.

### *January 17, 2024 Press Release*

103.    On January 17, 2024, the Company issued a press release responding to the Bleecker Street Report titled "LuxUrban Hotels Responds to the Inaccurate and Misleading Short Seller Report." The press release identified Defendant Kothari as a contact for the Company.

104.    The press release stated that "[a]s previously announced, the Company is scheduled to begin welcoming guests on or before January 30, 2024 at The Royalton by LuxUrban, Trademark Collection® by Wyndham and has a set date with the property's ownership to be delivered possession of the asset."

105.    The press release described the Company's growth and operating strategies as "transparent and consistent."

106.    These statements were materially false and misleading because: the Royalton was in fact not under an MLA and thus would not welcome guests on or before January 30, 2024; the

Royalton would not be rebranded under the "trademark Collection®" by Wyndham on or before January 30, 2024; and the Company was not "transparent and consistent" in disclosing growth to its investors.

### January 30, 2024 Press Release

107.    The truth continued to emerge on January 30, 2024, after market hours, when the Company issued a press release titled "LuxUrban Hotels to Operate James NoMad Hotel in New York City." In the press release, Defendants admitted that the Company had not "beg[un] welcoming guests … at the Royalton by LuxUrban, Trademark Collection® by Wyndham." However, to soften the blow to investors, the Company announced that it had purportedly entered into its largest MLA yet.

108.    The press release stated:

[LuxUrban] has signed and funded a 15-year Master Lease Agreement (MLA), plus two, five-year options, to operate The James NoMad Hotel in New York City. LuxUrban expects that The James will be rebranded as The J Hotel by LuxUrban, a Wyndham Grand® Hotel. The Company expects to take possession of the property and begin welcoming guests on or before March 1, 2024.

109.    Defendant Ferdinand was quoted as stating:

By *acquiring the long-term operating rights* to select hotels, LuxUrban allows owners and operators to retain ownership of their properties while unlocking the full commercial potential of each asset. We believe that *this transaction reflects the growing industry acceptance of our evolving asset-light business model and the inherent, value-driving benefits of our collaboration with Wyndham Hotels & Resorts*.

110.    Defendant Ferdinand also stated that the James NoMad acquisition was the Company's "largest hotel transaction to date" and allowed the Company to be more selective in choosing hotels with which to enter into MLAs, stating:

As our business continues to mature, the size and quality of the hotels we are targeting are expected to continue to improve, as will our ability to be selective in the assets we acquire under long-term MLA.

31

111.     Defendant Ferdinand was further quoted as stating "We expect to realize scale-drive cost efficiencies more fully as we build proper density in our existing cities."

112.     These statements were materially false and misleading because just as with the Truss Hotel, Trinity Hotel, and Royalton Hotel, the Company had not executed an MLA for the James NoMad Hotel and, thus, Defendants had no basis to state that the hotel would begin welcoming guests on or before March 1, 2024 or that the hotel would be rebranded as "The J Hotel by LuxUrban, a Wyndham Grand® Hotel." Therefore, the James NoMad deal did not reflect the "benefits of our collaboration with Wyndham," nor did it signify the Company's ability to be selective when entering into MLAs, that the Company would realize "scale-driven cost efficiencies" by increasing property density in the Company's existing cities, or any acceptance of the Company' asset-light business model. These statements artificially inflated the Company's growth and success associated with the MLA model and painted a false picture of the Company's partnership with Wyndham.

113.     On this news, LuxUrban's stock price fell $0.17 per share, or almost 4%, from a closing price of $4.33 on January 30, 2024 to close at $4.16 per share on January 31, 2024.

***February 6, 2024 Analyst/Investor Day and Associated Presentation Filed on Form 8-K***

114.     On February 6, 2024, the Company held an "analyst/investor day" where Defendants Ferdinand and Kothari presented on behalf of the Company. The Company filed a Form 8-K with the SEC (the "February 6 Form 8-K") attaching the slides used in the presentation.

115.     During the conference, Defendant Kothari stated the following about the James NoMad Hotel deal:

> Look, in 2024, what we've done so far to date, 1 month in -- we acquired The James, ***our largest property to date, our best property in terms of quality, asset quality. Look, our goals are to continue acquiring larger scale***. So you'll see acquisitions

that are greater unit count. So we have to do less of these higher quality, what's in the pipeline as well. Pipeline will change.

* * *

But what makes this relevant is really 2 specific things. One is it's our **largest acquisition to date. So what we're seeing now in the pipeline are bigger acquisitions, greater impact to unit count growth with less individual transactions, right?**

So cleaning really sort of coming down and making the larger impact with smaller -- with less deals. The second is -- **it's the highest quality today, right? So in terms of star category, it's 4.5 to 5 stars, slightly better than where we are maybe at this property or some of the other properties in our portfolio. Has on-site facilities that are going to be third-party operated and it's a New York City landmark property, right? So we're very proud of this. Just shows the ability of our team to execute as well as the support that we're getting not only from our partner, but also from third parties like The James**.

116.    These statements were false and misleading because the Company had not executed an MLA for the James NoMad Hotel.

117.    During the presentation, an attended asked the question "Did you tell us what key money was on the James hotel?" The transcript does not identify who but either Ferdinand or Kothari responded "We're not allowed to tell you."

118.    This statement was false and misleading because the Wyndham "key money" only applied to properties under lease, which the James NoMad Hotel was not.

### March 12, 2024 Bisnow Report

119.    On March 12, 2024, *Bisnow* reported (the "Bisnow Report") that the Company had been announcing deals with hotels before executed MLAs were in place. The Bisnow Report discussed how the Royalton Hotel did not have an executed MLA with the Company, and further discussed how the Trinity Hotel also did not have an executed MLA.

120.    The article continued:

The company also said in its two most recent quarterly filings that it had the 179-room Trinity Hotel in Los Angeles "under lease," a deal that was announced in

33

May. The Chetrit Group owns that hotel and denies it has a deal with LuxUrban.

***"The deal did not go through," Michael Chetrit told Bisnow in an email.***

Ferdinand told Bisnow that LuxUrban "fully executed a lease," but claimed Chetrit didn't update the building at 741 Eighth Ave. to make the changes necessary for operating the hotel.

We even wired them money which we have not gotten returned," Ferdinand wrote.

***Ferdinand forwarded Bisnow an email, dated Oct. 2, from one of the company's attorneys, containing a draft letter to Chetrit outlining the lack of repairs at the building and demanding repayment.***

***In that letter, LuxUrban attorneys wrote, "As a result, we will not be executing the proposed lease and will not be taking possession of the Premises."***

***March 26, 2024 Partial Corrective Disclosure***

121.    The truth continued to emerge on March 26, 2024 when, after two weeks of silence to investors, the Company announced in a press release that it had walked away from an unnamed deal which was later confirmed to be the Trinity Hotel deal. This news also constituted a partial corrective disclosure of Defendants' prior misstatements about the Trinity Hotel, the Truss Hotel, and the James NoMad Hotel, and overall growth of the Company and its integration with Wyndham.

122.    On this news, LuxUrban's stock price fell $0.64 per share, or almost 30%, from a closing price of $2.14 per share on March 26, 2024 to close at $1.50 per share on March 27, 2024.

***April 15, 2024 Form 10-K***

123.    On April 15, 2024, the Company filed its Form 10-K for 2023 (the "2023 Form 10-K") with the SEC, which was signed by Defendants Ferdinand, Kothari, Toboroff, Nelson, Webb, and non-parties Robert Arigo, Karl Rohman, Kim Schaefer, and Elan Blutinger. The 2023 Form 10-K did not include the Truss, Trinity, or the James NoMad hotels in the list of Company

properties.

### April 16, 2024 Full-Year Earnings Call

124.     On April 16, 2024, the Company held an earnings call to discuss its financial results for 2023. Defendants Ferdinand and Kothari presented to investors during the call.

125.     Also during the earnings call, an analyst asked "Can you comment if the James NoMad Hotel is in possession in March as expected?" In response, Defendant Ferdinand contradicted the 2023 Form 10-K by stating the following:

> Sure. So we are currently not operating, **but in possession**. Highgate is still managing the process, and we're working through the union bond issues with the union and the owner, and we do expect to take possession of that property as we work through the balance of the union bond issues, which we're in deep negotiations with the union currently.

126.     These statements contradicted the 2023 Form 10-K and were false and misleading because the Company had not executed an MLA with the James NoMad Hotel and thus was not "in possession" of the hotel. The Company's own disclosures stated that being "in possession" only happens after the lease is executed. These statements artificially inflated the Company's growth and success associated with the MLA model and falsely represented that the James NoMad Hotel would be generating revenue for the Company that quarter.

127.     The analyst then asked "Okay. And that's expected this quarter? Or can you comment on the timing of that?"

128.     Defendant Kothari responded: "Yes, I would expect this quarter. Yes, this quarter. Yes."

129.     These statements were false and misleading because the Company had not executed an MLA for the James NoMad Hotel and thus could not expect that the Company could begin operating the hotel "this quarter."

*May 13, 2024 Press Release and May 14, 2024 Form 8-K*

130.    On May 13, 2024, LuxUrban issued a press release to announce its financial results for the first quarter of 2024, titled "LuxUrban Hotels Inc. Announces 2024 First Quarter Financial Results," which the Company also attached to a Form 8-K it filed the following day with the SEC (the "May 14 Form 8-K"). The May 14 Form 8-K was signed by Defendant Kothari.

131.    The press release stated that, for the first quarter of 2024 compared to the first quarter of 2023: "[n]et rental revenue rose 27.6% to $29.1 million from $22.8 million"; "Gross profit (loss) was $(4.6) million as compared to gross profit of $5.4 million"; total operating expenses rose to $7.6 million or 26.2% of net rental revenue compared to $4.2 million or 18.5% of net rental revenue from 2023; and the net loss was $(16.8 million) compared to a net loss of $(2.8) million in 2023.

132.    These statements were materially false and misleading because, as revealed by the Restatement for Q1 2024 discussed herein: (1) net rental revenue was actually $13,957,361; (2) gross loss was actually $21,580,936; (3) total operating expenses were actually $16,004,552; and (4) net loss was actually $42,159,482.

*May 13, 2024 Form 10-Q*

133.    On May 13, 2024, the Company filed a Form 10-Q for the first quarter of 2024 with the SEC (the "1Q2024 Form 10-Q"), which was signed by Defendant Kothari and contained SOX certifications signed by Defendant Kothari certifying that it fairly presented, in all material respects, the financial condition, results of operations, and cash flows of the Company.

134.    The 1Q2024 10-Q stated that LuxUrban's consolidated financial statements contained therein had been "prepared … in accordance with the accounting principles generally accepted in the United States of America ('U.S. GAAP')."

135.    The Restatement revealed that this statement was false and misleading because, due to LuxUrban's GAAP violations, the Company reported materially incorrect financial statements.

136.    The 1Q2024 Form 10-Q also made multiple misstatements regarding LuxUrban's policies for recognizing revenue, stating the following, in relevant part:

*Revenue Recognition* — The Company's revenue is derived primarily from the rental of units to its guests. The Company accounts for revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 606. ***The Company recognizes revenue when obligations under the terms of a contract are satisfied and control over the promised goods and services is transferred to the guest. For the majority of revenue, this occurs when the guest occupies the unit for the agreed upon length of time and receives any services that may be included with their stay.*** Revenue is measured as the amount of consideration it expects to receive in exchange for the promised goods and services. The Company recognizes any refunds and allowances as a reduction of rental income in the consolidated statements of operation. ***Payment received for the future use of a rental unit is recognized as a liability and reported as rents received in advance on the balance sheets. Rents received in advance are recognized as revenue after the rental unit is occupied by the customer for the agreed upon length of time. The rents received in advance balance as of March 31, 2024, and December 31, 2023, was $6,576,403 and $4,404,216, respectively and is expected to be recognized as revenue within a one-year period.***

\* \* \*

***We record cash collected prior to stays as "bookings received in advance" on our balance sheet as a liability. These collections are then recognized as revenue when guests stay at our properties.*** In the event that there is a refund in accordance with our refund policy, revenue is not recognized.

137.    These statements were false and misleading because the Company recognized revenue in the first quarter of 2024 for "reservations that were booked and paid for, but the guest had not yet stayed at the property." Under GAAP, the Company should have reported nearly $8 million of this amount that it recognized as revenue as a liability.

138.    In addition, Defendant Kothari certified that he had "[e]valuated the effectiveness of the [Company's] disclosures controls and procedures and presented in this report [his]

conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation," and disclosed all "significant deficiencies and material weakness in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]"

139.    These statements were false and misleading because the Company admitted in the Restatement that the 1Q2024 Form 10-Q could not be relied upon and would need to be restated and that Defendant Kothari's certification regarding the effectiveness of the Company's internal controls needed to be "modified."

### May 14, 2024 Earnings Call

140.    On May 14, 2024, LuxUrban hosted an earnings call, which was led by Defendant Kothari, to discuss the Company's performance and financial results for the first quarter of 2024. During the call, Defendant Kothari stated:

> Let's discuss our results for the first quarter. Net rental revenue rose 27.6% to $29.1 million from $22.8 million driven by an increase in average units available to rent to 1535 from 571 partially offset by lower total RevPAR, the impact of seasonality to our current portfolio and other operational impacts mentioned above.
>
> * * *
>
> We reported a gross profit loss of $4.6 million as compared to a gross profit of $5.4 million.
>
> * * *
>
> Total operating expenses, including non-cash items, comprised $26.2 million of net rental revenue on Q1 2024 compared to $18.5 in last year's first quarter. Our operating loss for the quarter was $12.2 million. Net loss was $16.8 million compared to a net loss of $2.7 million.
>
> * * *
>
> Moving to the balance sheet, as compared to December 31, 2023, cash and cash equivalents rose to approximately $1.0 million compared to $0.8 million at December 31, 2023. Total debt was approximately $6.8 million as compared to total debt of $4.3 million. Accounts payable and accrued expenses increased approximately $28.9 million from $23.2 million.

141.    These statements were materially false and misleading because they were later retracted by the Restatement as discussed herein.

**2023 Proxy Statement**

142.    The Individual Defendants also made materially false and misleading statements in the Company's 2023 Proxy Statement. On June 5, 2023, the Company filed the 2023 Proxy Statement with the SEC. The 2023 Proxy Statement was solicited by Defendants Ferdinand, Chatmon, Toboroff, Berg, Nelson, and Webb and contained materially false and misleading statements in violation of Section 14(a) of the Exchange Act.

143.    The 2023 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) elect the seven director nominees to the Board; (2) ratify the appointment of Grassi & Co., CPAs, P.C. as the Company's independent registered public accounting firm for 2023; (3) approve an amendment to the Company's 2022 Long Term Incentive Equity Plan (the "Plan") to increase the number of shares of common stock available for issuance thereunder; and (4) approve an issuance of up to 6,740,000 shares of common stock to Greenle Partners LLC.

144.    With respect to the Code of Conduct, the 2023 Proxy Statement stated:

Our Board of Directors adopted a code of business conduct and ethics that establishes the standards of ethical conduct applicable to all of our directors, officers, employees, consultants and contractors. The code of ethics addresses, among other things, competition and fair dealing, conflicts of interest, financial matters and external reporting, compliance with applicable governmental laws, rules and regulations, company funds and assets, confidentiality and corporate opportunity requirements and the process for reporting violations of the code of ethics, employee misconduct, conflicts of interest or other violations. Any waiver of our code of ethics with respect to our Chief Executive Officer, Chief Financial Officer, Secretary and Treasurer, Chief Operating Officer and President, or persons performing similar functions may only be authorized by our Nominating and Corporate Governance Committee and will be promptly disclosed as required by law and Nasdaq regulations and posted on our website. Amendments to the code of ethics must be approved by our Board of Directors and will be promptly disclosed and posted on our website (other than technical, administrative or non-substantive changes). Our code of ethics is publicly available on our website at *http://www.luxurbanhotels.com* and in print to any stockholder who requests a copy.

145.    Regarding the Board's role in risk oversight, the 2023 Proxy Statement stated:

One of the key functions of our Board of Directors is informed oversight of our risk management process. Our Board of Directors focuses on our general risk management strategy, the most significant risks facing us, and oversees the implementation of risk mitigation strategies by management and for overseeing management of regulatory risks. Our Board of Directors administers this oversight function directly, with support from the four standing committees, our audit committee, our compensation committee, our finance, risk and investment committee and our nominating and corporate governance committee, each of which addresses risks specific to its respective areas of oversight. In particular, our Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management takes to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. Our Audit Committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our internal audit function. Our compensation committee assesses and monitors whether any of our compensation policies and programs have the potential to encourage excessive risk-taking. Our finance, risk and investment committee is responsible for managing risks associated with our capital structure, credit, liquidity and operations, as well as financial and cybersecurity risks, and oversees our enterprise risk management framework. Our nominating and corporate governance committee provides oversight with respect to corporate governance and ethical conduct. All committees report to the full Board of Directors as appropriate, including when a matter rises to the level of a material or enterprise level risk. In addition, the Board of Directors receives detailed regular reports from members of our senior management and other personnel that include assessments and potential mitigation of the risks and exposures involved with their respective areas of responsibility. Our Board of Directors does not believe that its role in the oversight of our risks affects the Board of Directors' leadership structure.

146.    Regarding the proposal to amend the Plan, the 2023 Proxy Statement stated:

Our 2022 Long-Term Incentive Equity Plan (the "EIP") was adopted in January 2022. The EIP permits the grants of stock options, stock appreciation rights ("SARs"), restricted common stock and other stock-based awards. A total of 3,000,000 shares of common stock were originally authorized for issuance under the EIP. As of December 31, 2022, approximately 147,016 shares (and approximately 168,892 shares as of April 18, 2023) of our common stock remain available for issuance for equity-based awards under the EIP.

The Board of Directors believes that the EIP has benefited the Company by assisting in recruiting and retaining the services of individuals with ability and initiative and enabling such individuals to participate in the future services of the Company and by aligning the interests of such individuals with the interests of the Company and its stockholders.

On April 13, 2023, the Board of Directors amended the EIP, subject to the approval of stockholders (the "Amendment"). The Amendment is described below and includes an increase in the total number of shares of common stock that may be issued pursuant to awards granted under the EIP from 168,892 shares that remain available for issuance under the EIP to 1,622,016 shares.

The increase in the EIP's share authorization will continue the Company's ability to provide incentive and equity compensation opportunities pursuant to the EIP. The Board of Directors believes that the Company's ability to provide competitive levels and types of

compensation, including equity and incentive compensation opportunities, is important to recruiting and retaining talented executives and other key employees. Absent stockholder approval of the Amendment, the share authorization under the EIP could become exhausted and the Company would be unable to provide equity and incentive compensation pursuant to awards granted under the EIP. The Company thus would be required to use cash-based awards as the medium of payment for all incentive compensation.

The Amendment is described below and the material features of the EIP, as amended by the Amendment, are summarized below. A copy of the Amendment is included as Appendix A to this Amended Proxy Statement. The summary below is qualified in its entirety by reference to the text of the EIP.

147.    Under the direction and watch of Defendants Ferdinand, Chatmon, Toboroff, Nelson, Berg, and Webb, the 2023 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

148.    The 2023 Proxy Statement also failed to disclose, *inter alia*, that the Company did not in fact execute an MLA with the Trinity Hotel. Because of the misleading inclusion of the Trinity Hotel in the Company's portfolio, the Company's total number of rentable rooms was artificially inflated by 179 rooms.

149.    In exercise of reasonable care, Defendants Ferdinand, Chatmon, Toboroff, Nelson, Berg, and Webb should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2023 Proxy Statement, including, but not limited to, the re-election of Defendants Ferdinand, Chatmon, Toboroff, Berg, Nelson, and Webb to the Board and approval of the Plan.

150.    As a result of Defendants Ferdinand, Chatmon, Toboroff, Berg, Nelson, and Webb causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Ferdinand, Chatmon, Toboroff, Berg, Nelson, and Webb to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Grassi & Co., CPAs, P.C. as the independent registered public accounting firm for the Company for the fiscal year ending on December 31, 2023; (3) approve an amendment to the 2022 Long-Term Incentive Equity Plan to increase the number of shares of the Company's common stock available for awards made thereunder and certain other administrative changes; and (4)  approve an issuance of up to 6,740,000 shares of common stock to Greenle Partners LLC.

## THE TRUTH FULLY EMERGES

### *August 9, 2024 Form 8-K*

151.    On August 9, 2024, the Company filed a Form 8-K with the SEC (the "August 9 Form 8-K") announcing that the Company's 1Q2024 Form 10-Q could no longer be relied upon due to an overstatement of revenues and that, therefore, a restatement of the 1Q2024 Form 10-Q was required. The August 9 Form 8-K stated that there would be approximately a $13.75 million decrease in revenues, a write-off of approximately $1.5 million for deposits with third party reservation processors, an increase in unearned revenue of $8.05 million, and an increase in net loss of approximately $9.55 million.

152.    On this news, LuxUrban's stock price fell $0.013 per share, or about 14%, from a closing price of $0.092 on August 9, 2024 to close at $0.079 per share on August 10, 2024.

### *August 20, 2024 Restatement*

153.    The truth fully emerged when the Company filed its Restatement for the first quarter of 2023.  The Restatement was drastically different than what was originally reported. The

current assets were actually only $5 million, and not $20.4 million which was originally reported. Net rental revenue was actually less than $14 million and not $29 million that was originally reported. Operating expenses were actually $16 million and not $7.6 million that was originally reported. Net loss was actually over $42 million and not $16.79 million that was originally reported.

154.    The Restatement also revealed that cash flows, an essential part of the Company's MLA strategy, mostly consisted of rents received in advance. The Company reported that rents received in advance made up of over $10 million of cash flows rather than the originally reported $2.2 million. Even though originally the Company assured investors that rents received in advance were recognized as a liability, the Company stated that rents received in advance were recognized as revenue in the first quarter of 2024.

155.    On this news, the price of the Company's common stock fell $0.03 per share, or approximately 3.95%, from a closing price of $0.076 per share on August 20, 2024 to close at $0.073 per share on August 21, 2024.

## DAMAGES TO LUXURBAN

156.    As a direct and proximate result of the Individual Defendants' conduct, LuxUrban will lose and expend many millions of dollars.

157.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgments associated with the Securities Class Action filed against the Company, its former CEO, and its former CFO/Co-CEO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

158.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the

Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

159.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

160.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

161.    Such losses also include over $5,000,000 in insider sales by Defendant Ferdinand during the Relevant Period while the Company's stock price was artificially inflated and before the truth was revealed.

162.    As a direct and proximate result of the Individual Defendants' conduct, LuxUrban has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

163.    Plaintiff brings this action derivatively and for the benefit of LuxUrban to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of LuxUrban, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

164.    LuxUrban is named solely as a nominal party in this action. This is not a collusive

action to confer jurisdiction on this Court that it would not otherwise have.

165.    Plaintiff is, and has been at all relevant times, a shareholder of LuxUrban. Plaintiff will adequately and fairly represent the interests of LuxUrban in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

166.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

167.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, LuxUrban's Board consisted of the following five individuals: Defendant Ferdinand and non-parties Elster, Moinian, Shapiro, and Theodore (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors that were on the Board at the time this action was filed.

168.    Additional reasons that demand on Defendant Ferdinand is futile follow. Defendant Ferdinand cofounded the Company and served as a member of the Board since the Company's inception to June 2024, where he then assumed a consulting role. During this time, Defendant Ferdinand served as both Chairman of the Board, CEO, and later Co-CEO with Defendant Kothari. In December 2024, Defendant Ferdinand was elected to the Board and was named interim CEO. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Ferdinand with his principal occupation for which he receives handsome compensation. As the Company's CEO and Executive Chairman, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the

scheme, and consciously disregarded his duty to protect corporate assets. Further he signed, *inter alia*, the May 9 Form 8-K, May 15 Form 8-K, 2Q2023 Form 10-Q, September 1 Form 8-K, 3Q2023 Form 10-Q, and November 9 Form 8-K, which all contained materially false and misleading statements. Moreover, Defendant Ferdinand is a defendant in the Securities Class Action. In addition, his insider sales during the Relevant Period, where he netted proceeds of over $5 million, further demonstrate his motive in facilitating and participating in the scheme. In addition, he solicited the false and misleading 2023 Proxy Statement, which resulted in shareholders voting, *inter alia*, to re-elect him to the Board, thereby allowing him to continue breaching his fiduciary duties to the Company. For these reasons, Defendant Ferdinand breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Additional reasons that demand on non-party Elster is futile follow. Elster has served as a member of the Board since December 2024. He also serves as the Chief Development Officer of the Company. The Company provides Elster with his principal occupation for which he receives handsome compensation. He is beholden to the other members of the Board that enable that compensation, including Defendant Ferdinand, a primary wrongdoing. In addition, despite Defendant Ferdinand's misconduct as set forth herein, Elster still chose to elect Defendant Ferdinand to the Board and to serve as the Company's Interim CEO, thereby allowing him to continue breaching his fiduciary duties to the Company. Therefore, he is similarly unlikely to take action against Defendant Ferdinand now. In addition, Elster is unlikely to take action that would risk his primary source of livelihood. Moreover, as the Company admits, he is a non-independent director. For these reasons, Elster is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Additional reasons that demand on non-parties Elster, Shapiro, Theodore, and Moinian is futile follow. Elster, Shapiro, Theodore, and Moinian have made no efforts to remove Defendant Ferdinand from his positions of authority at the Company as a director and CEO, despite his continuous misconduct as alleged herein. Instead, they have allowed him to remain in a position where he can continue to harm LuxUrban's brand and reputation. A disinterested board would not sit idly by and allow a fellow director and, even more critically, the Company's CEO, to remain in such a position, particularly after all of the false and misleading statements he previously made to investors. When Defendant Ferdinand was previously LuxUrban's CEO and a board member, he made multiple false and misleading statements regarding the number of properties in the Company's portfolio. Even when the Bleecker Street Report and Bisnow Report exposed Defendant Ferdinand's false and misleading statements, he continued to tell investors false and misleading statements about the Company having executed MLAs with the James NoMad Hotel and Truss Hotel. Because Elster, Shapiro, Theodore, and Moinian have allowed Defendant Ferdinand to remain as a Company director and as the Company's CEO despite such continuous misconduct, they cannot be reasonably expected to take action against Defendant Ferdinand. For these reasons, non-parties Elster, Shapiro, Theodore, and Moinian are not independent or disinterested, and demand upon them is futile and, therefore, excused.

171.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

172.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

173.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

174.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

175.    Under the direction and watch of Defendants Ferdinand, Chatmon, Toboroff, Nelson, Berg, and Webb, the 2023 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

176.    The 2023 Proxy Statement also failed to disclose, *inter alia*, that the Company did not in fact execute an MLA with the Trinity Hotel. Because of the misleading inclusion of the Trinity Hotel in the Company's portfolio, the Company's total number of rentable rooms was artificially inflated by 179 rooms.

177.    In exercise of reasonable care, Defendants Ferdinand, Chatmon, Toboroff, Nelson, Berg, and Webb should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2023 Proxy Statement, including, but not limited to, the re-election of Defendants Ferdinand, Chatmon, Toboroff, Berg, Nelson, and Webb to the Board and approval of the Plan.

178.    As a result of Defendants Ferdinand, Chatmon, Toboroff, Berg, Nelson, and Webb causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Ferdinand, Chatmon, Toboroff, Berg, Nelson, and Webb to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Grassi & Co., CPAs, P.C. as the independent registered public accounting firm for the Company for the fiscal year ending on December 31, 2023; (3) approve an amendment to the 2022 Long-Term Incentive Equity Plan to increase the number of shares of the Company's common stock available for awards made thereunder and certain other administrative changes; and (4)  approve an issuance of up to 6,740,000 shares of common stock to Greenle Partners LLC.

179.    The Company was damaged as a result of Defendants Ferdinand, Chatmon, Toboroff, Berg, Nelson, and Webb's material misrepresentations and omissions in the 2023 Proxy Statement.

180.    Plaintiff, on behalf of LuxUrban, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

181.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of LuxUrban's business and affairs.

183.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

184.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of LuxUrban.

185.    In breach of their fiduciary duties owed to LuxUrban, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Trinity Hotel, the Royalton Hotel, the Truss Hotel, and the James NoMad Hotel all in fact did not have executed MLAs and thus should not have been included in the Company's portfolio; (2) the Company's 1Q2024 Form 10-Q erroneously included rents received in advance as a part of the Company's revenue; and (3) as a result, the Defendants had massively overstated the Company's overall financial and business prospects in the 1Q2024 Form 10-Q. As a result of the foregoing, LuxUrban's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

186.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

187.    Also, in breach of their fiduciary duties, the Individual Defendants failed to

maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

188.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

189.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

190.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, LuxUrban has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

191.    Plaintiff, on behalf of LuxUrban, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Unjust Enrichment**

192.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, LuxUrban.

194.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from LuxUrban that was tied to the performance or artificially inflated valuation of LuxUrban or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

195.    Plaintiff, as a shareholder and representative of LuxUrban, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

196.    Plaintiff, on behalf of LuxUrban, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

197.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence LuxUrban, for which they are legally responsible.

199.    As a direct and proximate result of the Individual Defendants' abuse of control, LuxUrban has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, LuxUrban has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.    Plaintiff, on behalf of LuxUrban, has no adequate remedy at law.

### FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

201.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

202.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of LuxUrban in a manner consistent with the operations of a publicly held corporation.

203.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, LuxUrban has sustained and will continue to sustain significant damages.

204.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

205.    Plaintiff, on behalf of LuxUrban, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

206.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

208.    As a further result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused LuxUrban to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

209.    As a result of the waste of corporate assets, the Individual Defendants are each

liable to the Company.

210.    Plaintiff, on behalf of LuxUrban, has no adequate remedy at law.

### SEVENTH CLAIM
**Against Defendants Ferdinand and Kothari for Contribution Under Sections 10(b) and 21D of the Exchange Act**

211.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

212.    LuxUrban and Defendants Ferdinand and Kothari are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Ferdinand's and Kothari's willful and/or reckless violations of their obligations as officers and/or directors of LuxUrban.

213.    Defendants Ferdinand and Kothari, because of their positions of control and authority as officers and/or directors of LuxUrban, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of LuxUrban, including the wrongful acts complained of herein and in the Securities Class Action.

214.    Accordingly, Defendants Ferdinand and Kothari are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

215.    As such, LuxUrban is entitled to receive all appropriate contribution or indemnification from Defendants Ferdinand and Kothari.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of LuxUrban, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to LuxUrban;

(c)    Determining and awarding to LuxUrban the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing LuxUrban and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect LuxUrban and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of LuxUrban to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding LuxUrban restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 27, 2025

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*_____
Timothy Brown
Saadia Hashmi
Elizabeth Donohoe
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
      shashmi@thebrownlawfirm.net
      edonohoe@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Fen Cosyns, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 26__ day of March, 2025.

Signed by:

*Fen Cosyns*

D6E11090B005420...

Fen Cosyns